IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICHELLE A. FLOWERS,

             Plaintiff,

      v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

             Defendant.

Case No. 6:14-cv-01951-SB

**FINDINGS AND
RECOMMENDATION**

---

**BECKERMAN, Magistrate Judge.**

Richelle Flowers ("Flowers") appeals from the Commissioner of the Social Security's ("Commissioner") denial of her application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The Court has jurisdiction over Flowers' appeal pursuant to 42 U.S.C. § 1383(c)(3), which incorporates the review provisions of 42 U.S.C. § 405(g). For the reasons that follow, the Commissioner's decision should be reversed and remanded for an award of benefits.

Page 1 - FINDINGS AND RECOMMENDATION

## I. FACTS AND PROCEDURAL HISTORY

Flowers was born in May 1962, making her forty-seven years old on December 21, 2009, the alleged disability onset date. (Tr. 29, 135-36.) Flowers stands five-feet, five-inches tall and weighs 230 pounds. Flowers has a high school education, and her past relevant work includes time as a waitress. She alleges that she is disabled due primarily to irritable bowel syndrome and abdominal pain.

On December 21, 2009, the alleged disability onset date, Flowers was admitted to the hospital with acute abdominal pain and "inflammatory process involving the right lower quadrant[.]" (Tr. 210.) Flowers reported that she had "a history of hepatitis C," that she is an alcoholic who drinks at least a six-pack a day and has no interest in treatment, that her abdominal pain was accompanied by "diarrhea at least [four] times a day," and that she "has never had diarrhea before." (Tr. 244.) After undergoing two colonoscopies and having adhesions lysed, Flowers was discharged from the hospital on December 31, 2009, with a diagnosis of "[p]resumed diverticulitis of the right colon." (Tr. 210.)

On January 17, 2011, Flowers was seen by Dr. Craig Chamberlain ("Dr. Chamberlain"), regarding a three to four day "history of severe right lower quadrant pain of a sharp character[.]" (Tr. 248.) Flowers reported that "the onset of her pain occurred when her cat jumped on her abdomen," that "she has no history of diarrhea," and that she "has not had any pain since [December 2009]." (Tr. 248.) Dr. Chamberlain noted that Flowers was suffering from acute abdominal pain of "uncertain etiology," and stated that "[t]his would be a very atypical presentation for inflammatory bowel disease, although [it] could represent some acute infectious process involving the terminal ileum." (Tr. 249.) Dr. Chamberlain added that he agreed with the plan to give Flowers intravenous

Page 2 - FINDINGS AND RECOMMENDATION

fluids, pain medications, and antibiotics, and advised her to follow up in the event she developed diarrhea.

On January 20, 2011, Dr. Chamberlain performed a "[c]olonoscopy with polypectomy and biopsy" on Flowers. (Tr. 259.) Dr. Chamberlain noted that he found "no endoscopic evidence of diverticulitis," and that he did not "see [an] obvious explanation for her severe abdominal pain[.]" (Tr. 260.)

On April 1, 2011, Flowers visited Dr. Jamison Morgan ("Dr. Morgan"), complaining of abdominal and pelvic pain. Flowers reported that her pain "occurs only with periods," and that her "associated symptoms have included chronic constipation." (Tr. 276.) Flowers added "that she has essentially been concerned because she does not understand what exactly the source is of the right lower quadrant pain." (Tr. 276-77.) Dr. Morgan performed a colposcopy and obtained biopsies from areas of the cervix. A pathology report came back positive for cancer. Flowers underwent a total abdominal hysterectomy on May 17, 2011, and a pathology report was "negative as of discharge." (Tr. 280.)

On May 24, 2011, Flowers was admitted to the hospital based on complaints of nausea, vomiting, and diarrhea. Flowers was discharged the following day, after Dr. Audrey Garrett ("Dr. Garrett") was able to rule out Clostridium difficile (or "C. diff") colitis, and Flowers' condition improved.

Flowers presented for a follow-up visit with Dr. Garrett on June 13, 2011. Flowers reported that she was "feeling great," but continued to be bothered by bloating. (Tr. 307.) Flowers informed Dr. Garrett that "[s]he would like a little bit more Percocet to help her get through this bloating." (Tr. 307.) Flowers added that her bowels were "moving relatively well," but she was experiencing some

"back and forth between loose stool and constipation," which she was able to "take care of" by "self medicating with her postop pain meds." (Tr. 307.) Dr. Garrett provided Flowers with additional Percocet, and advised her to follow up in three to four months "for ongoing cancer surveillance." (Tr. 307.)

Flowers completed an Adult Function Report on July 26, 2011, in support of her application for benefits. Flowers stated that her gastrointestinal issues (i.e., "either total[l]y constipated or extreme diarr[h]ea") and pain negatively impact her ability to walk, sleep, tolerate certain foods, sit, stand, lift, squat, bend, reach, kneel, climb stairs, and complete tasks. Flowers described her typical day as consisting of using the restroom on a number of occasions, preparing simple meals, taking medication, reading, watching television, feeding her cats, taking two or three five-minute walks, and going to sleep. Flowers added that she spends between thirty minutes and an hour shopping for food each week, does not have a driver's license, enjoys playing video games, reading, and watching television, does not participate in social activities, "slowly" washes dishes and vacuums, and "very slowly [and] carefully" performs personal care tasks (dress, bathe, care for hair, shave, feed self, use the toilet). (Tr. 149-50.)

James Stewart ("Stewart") completed a Third-Party Adult Function Report on July 26, 2011, in support of Flowers' application for benefits. Stewart stated that he is Flowers' roommate, and they spend approximately four hours together each day watching television. Stewart also stated that Flowers is capable of feeding her cats, performing personal care tasks without any problems, preparing simple meals, taking short walks twice a day, doing some "light cleaning," and shopping on a weekly basis. (Tr. 157.) Stewart added that Flowers is up frequently at night due to her stomach

issues, and has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs.

Flowers completed a Work History Report on July 28, 2011, wherein she noted that she was self-employed as a housekeeper and can collector between 2005 and early 2011. The latter position, according to Flowers, involved walking three to four miles per day, five to six days a week, checking dumpsters, parks, and the city center for cans to recycle. The former position involved laundry and vacuuming at an apartment once a week, and lifting twenty pounds occasionally and ten pounds frequently.

On September 7, 2011, Flowers spoke with Dr. Snell Fontus ("Dr. Fontus") about the results of her recent computerized tomography ("CT") scan. Flowers reported that she was "tired of having to limit her diet so much but realizes that there is something that she is eating that is triggering her episodes of right lower quadrant pain and tenderness, or at least exacerbating her symptoms." (Tr. 324.) "The CT scan of her abdomen and pelvis was reviewed with [Flowers] and it was a completely normal study." (Tr. 324.) Ultimately, Dr. Fontus felt that he really did "not have anything to offer" Flowers, because he believed her symptoms were triggered by "something that she eats . . . [or] does not eat[.]" (Tr. 324.)

Flowers was seen by Dr. Garrett on September 26, 2011. Flowers reported that she had been experiencing "exquisite pain in her upper abdomen," but her "bowel movements [were] quite regular." (Tr. 447.) Dr. Garrett and a colleague from the radiology department reviewed Flowers' CT scans from the past year, and concluded that there was "noting to explain [Flowers'] new symptomatology on exam [which was consistent] with what Dr. Fontus told her as well." (Tr. 447.)

Page 5 - FINDINGS AND RECOMMENDATION

Dr. Garrett counseled Flowers on losing weight, and prescribed pain medication in an attempt to treat her pain.

Flowers presented for a follow-up visit with Dr. Chamberlain on October 27, 2011. Flowers complained of continued abdominal pain, and reported that it was accompanied by a "significant amount of bloating, not necessarily affected by eating but made worse with movement." (Tr. 337.) Flowers also reported that she was taking Percocet when necessary to treat her pain. Based on her medical history, Dr. Chamberlain was "suspicious" that Flowers was suffering from irritable bowel syndrome. (Tr. 338.)

On December 8, 2011, Dr. Richard Alley ("Dr. Alley"), a non-examining state agency physician, completed a physical residual functional capacity assessment. Based on his review of the record evidence, Dr Alley found that Flowers could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; push and/or pull in accordance with the lift and carry restriction; occasionally stoop, crouch, crawl, and climb ladders, ropes, or scaffold; and balance, kneel, and climb ramps and stairs without limitation. Dr. Alley also found that Flowers had no manipulative, visual, communicative, or environmental limitations.

Flowers visited Dr. Chamberlain on February 23, 2012, complaining of "more severe" pain in her abdomen and bloating. (Tr. 342.) Flowers rated the pain as a five on ten-point scale, but added that "it gets worse at other times." (Tr. 342.) Flowers also stated that she "still has bowel movements that vary between constipation and diarrhea but she tends to be more constipated." (Tr. 342.) Dr. Chamberlain noted that he "still fe[lt]" that irritable bowel syndrome was "likely [the] primary diagnosis," but agreed to order another CT scan based on Flowers' complaints of worsening pain.

Page 6 - FINDINGS AND RECOMMENDATION

(Tr. 343.) The CT scan revealed "[n]o acute abdominal or pelvic abnormality," and was indicative of generalized abdominal pain, diverticulosis of the colon (without hemorrhage), and irritable bowel syndrome. (Tr. 349.)

On March 29, 2012, Dr. Mary Ann Iyer ("Dr. Iyer"), a non-examining state agency physician, completed a second physical residual functional capacity assessment. Based on her review of the record evidence, Dr. Iyer concluded that Flowers could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; push and/or pull in accordance with the lift and carry restriction; occasionally stoop, crouch, crawl, and climb ladders, ropes, or scaffold; and balance, kneel, and climb ramps and stairs without limitation. Dr. Iyer also concluded that Flowers did not suffer from manipulative, visual, communicative, or environmental limitations.

On April 10, 2012, Flowers presented for a follow-up visit with Dr. Christine Jensen-Fox ("Dr. Jensen-Fox"), regarding "issues of chronic abdominal pain and bloating." (Tr. 368.) After noting that multiple colonoscopies and CT scans were "unremarkable," Dr. Jensen Fox stated that "[i]t has all boiled down to irritable bowel syndrome." (Tr. 368.) Dr. Jensen-Fox added that celiac and allergen panels were negative, which suggests that Flowers "does not seem to have any food sensitivities." (Tr. 368.) Ultimately, Dr. Jensen-Fox advised Flowers to avoid dairy products with the exception of non-fat yogurt, take probiotic capsules or powder on a daily basis, and "take up an exercise regimen of . . . walking at least [thirty] minutes [five] days a week for stress reduction." (Tr. 368.)

In early June 2012, Dr. Chamberlain completed a medical evaluation form at the request of Flowers' attorney. Dr. Chamberlain noted that Flowers had been diagnosed with diverticulosis,

irritable bowel syndrome, gastroesophageal reflux disease, and chronic abdominal pain. In terms of Flowers' ability to stand, walk, and sit, Dr. Chamberlain stated that the degree of limitation was "[u]nknown[.]" (Tr. 352.) In terms of Flowers' ability to lift, Dr. Chamberlain stated that Flower had "no definitive limitation based on [gastrointestinal diagnoses]." (Tr. 352.) Finally, and most important for present purposes, Dr. Chamberlain "estimate[d]" that Flowers would be unable to maintain a regular work schedule (e.g., an eight-hour day, five days per week, with a thirty to sixty minute lunch and a ten to fifteen minute break in the morning and afternoon) "[two] days per month." (Tr. 354.)

On June 14, 2012, after Flowers sought reconsideration of the denial of benefits, Dr. William McCollum ("Dr. McCollum"), a non-examining state agency medical consultant, reviewed the record evidence, including Dr. Chamberlain's June 2012 medical evaluation form. (*Compare* Tr. 79, *with* Tr. 77.) Dr. McCollum ultimately affirmed Dr. Iyer's March 2012 physical residual capacity assessment.

Flowers was seen for a follow-up visit with Dr. Jensen-Fox on July 30, 2012. Flowers reported that she had "transitioned to daily diarrhea" since May of 2012, but had been trying to avoid dairy products and eat yogurt with probiotics in the morning. (Tr. 366.) Flowers also reported that she had "been under a great deal of interpersonal stress" since the beginning of June 2011, because "an acquaintance" with "several children" was "relying on [Flowers] to meet many of their needs." (Tr. 366.) In her progress note, Dr. Jensen-Fox observed that Flowers "is felt to be suffering from irritable bowel syndrome after a very thorough [gastrointestinal] workup," and she advised Flowers to "get Probiotic packets and avoid dairy all together until the diarrhea gets under better control." (Tr. 365.)

Page 8 - FINDINGS AND RECOMMENDATION

On November 21, 2012, Flowers presented for a follow-up visit with Dr. Chamberlain. Flowers reported continued "abdominal pain and alternating constipation and diarrhea." (Tr. 428.) Dr. Chamberlain noted that Flowers' irritable bowel syndrome was "clinically stable" on her current medications. (Tr. 429.) Dr. Chamberlain counseled Flowers on using a probiotic and increasing the fiber in her diet.

Flowers returned to Dr. Jensen-Fox's office on December 11, 2012. Flowers complained of "night sweats, migraine headache[s], and also [an] injury to [her] left index finger." (Tr. 363.) An x-ray of Flowers' left index finger proved to be unremarkable, and Dr. Jensen-Fox "rule[d] out a significant disease causing night sweats." (Tr. 362, 373.) Dr. Jensen-Fox counseled Flowers on stress reduction, because she admitted that "many of her [migraine] headaches are [brought on] by stress." (Tr. 362.)

Flowers returned to Dr. Garrett's office on January 7, 2013, for ongoing cancer surveillance. Flowers reported that "she and her significant other [had recently] purchased a home in Springfield," that she was "not doing much in the way of exercise," that she was still experiencing "ongoing abdominal pain issues but . . . [wa]s learning to deal with it," and that she "[i]n general . . . feels quite well[.]" (Tr. 438-39.) In her progress notes, Dr. Garrett observed that Flowers "has 100% functional status," and that she "again informed [Flowers] of the benefits of diet and exercise." (Tr. 439-40.)

On April 20, 2013, Flowers was admitted to the emergency room at McKenzie-Willamette Medical Center. Flowers reported that she had been drinking, and that she "slipped on some oil on the floor and felt a pop in her [left] foot." (Tr. 385.) Dr. Leif Meyers ("Dr. Meyers") noted that an x-ray revealed an "obvious fracture of the third metatarsal and likely fracture of the second[.]" (Tr.

386.) Flowers underwent foot surgery the following month, and had a plate and screws placed along the fractures.

An administrative law judge ("ALJ") convened a hearing on August 1, 2013, at which Flowers testified about the limitations resulting from her impairments. Flowers testified that she is disabled primarily due to her "intestinal issues," which lead either to severe constipation or diarrhea. (Tr. 33.) Flowers acknowledged that her medications have been somewhat effective (i.e., she has recently avoided trips to the hospital due to severe constipation, and her abdominal pain is "not as intense"). (Tr. 34.) However, Flowers added that she needs to be close to a bathroom at all times, her typical day consists of five to eight visits to the bathroom, including at least one thirty-minute stint, and she had to change her clothes after an "accident" at WinCo Foods in mid-April 2013. (Tr. 35, 38.) Flowers also stated that stress and dairy can cause her to use the restroom up to fifteen times a day.

The ALJ posed a series of questions to a vocational expert ("VE") who testified at Flowers' hearing. The ALJ first asked the VE to assume that a hypothetical worker of Flowers' age, education, and work experience could perform a full range of light work, except for work requiring more than occasional stooping, crouching, crawling, and climbing.[1] The VE testified that the hypothetical worker could perform Flowers' past relevant work as a waitress (DOT 311.477-030), and could also be employed as a routing clerk (DOT 222.587-038), laundry sorter (DOT 361.687-014), and cleaner/polisher (DOT 709.687-010). The VE further testified that there were 3,040,000 routing clerk

---

[1] The full range of light work typically "involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds," and standing or walking "for a total of approximately six hours of an eight-hour workday[.]" *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

jobs in the national economy, including 39,000 in Oregon; 422,000 laundry sorter jobs in the national economy, including 5,500 in Oregon; and 402,000 cleaner/polisher jobs in the national economy, including 4,800 in Oregon. The ALJ next asked the VE about the customary tolerance for absences in the workplace. The VE stated that tolerance for "ongoing absences is no more than two per month," and that "on lower skill level jobs two [absences] per month on an ongoing basis would be unacceptable." (Tr. 49.)

Flowers' attorney also posed a series of questions to the VE. Flowers' attorney first asked the VE to assume that the hypothetical worker would need "one break during the work day that was not scheduled that would be for about a half hour where they would need to use the restroom[.]" (Tr. 50.) The VE confirmed that, absent accommodations by the employer, the hypothetical worker would not be employable. Next, Flowers' attorney asked the VE to assume that the hypothetical worker could stand and walk for no more than two hours during an eight-hour workday, as opposed to six hours. The VE testified that the jobs of waitress, routing clerk, laundry sorter, and cleaner/polisher would not be suitable for the hypothetical worker, but the VE would "be able to identify sedentary work[.]" (Tr. 51.) Finally, Flowers' attorney asked the VE whether an individual with past relevant work experience as a waitress would possess any skills that are transferable to sedentary work. The VE stated that the job of "waitress [is] at best [a] semi-skilled [job so] there'd be no transferable skills." (Tr. 52.)

In a written decision issued on August 22, 2013, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920, and found that Flowers was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Flowers' petition for

Page 11 - FINDINGS AND RECOMMENDATION

review, making the ALJ's decision the Commissioner's final decision. Flowers timely appealed to

the federal district court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §

423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining

whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r*

*Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the
> claimant's impairment severe? (3) Does the impairment meet or equal [one of the
> listed impairments]? (4) Is the claimant able to perform any work that he or she has
> done in the past? and (5) Are there significant numbers of jobs in the national
> economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process.

*Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the

burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137,

140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the

Commissioner must show the claimant can perform other work that exists in significant numbers in

the national economy, "taking into consideration the claimant's residual functional capacity, age,

education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the

Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.      The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Flowers had not engaged in substantial gainful activity since June 1, 2011, the day she filed her application for benefits.[2] At the second step, the ALJ found that Flowers had the following severe medically determinable impairments: "history of colitis/diverticulitis/irritable bowel syndrome and obesity." (Tr. 11.)

At the third step, the ALJ found that Flowers' combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Flowers' residual functional capacity ("RFC"), and found that she could perform the full range of light work as defined under 20 C.F.R. § 416.967(b), except for work requiring "more than occasional stooping, crouching, crawling, and climbing." (Tr. 12.)

At the fourth step, the ALJ concluded that Flowers was capable of performing past relevant work as a waitress, as the position did not require Flowers to perform any work-related activities that were precluded by her RFC. Although the ALJ's step-four finding was sufficient to conclude that benefits should be denied, the ALJ proceeded to the fifth step and found, as an alternative reason to deny Flowers' application for Supplemental Security Income benefits, that there were other jobs existing in significant numbers in the national economy that Flowers could perform, such as a routing clerk (DOT 222.587-038), laundry sorter (DOT 361.687-014), or cleaner/polisher (DOT

---

[2] The "earliest" a Supplemental Security Income "claimant can obtain benefits is the month after which he filed his application." *Schiller v. Colvin*, No. 1:12-cv-00771-AA, 2013 WL 3874044, at *1 n.1 (D. Or. July 23, 2013) (citing 20 C.F.R. § 416.335).

709.687-010). Based on the foregoing findings, the ALJ concluded that Flowers was not disabled, as defined under the Social Security Act, "since June 1, 2011, the date the application was filed[.]" (Tr. 17.)

## III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

In this appeal, Flowers argues that the ALJ erred by (1) failing to offer specific, clear, and convincing reasons for discrediting her testimony; (2) failing to offer legally sufficient reasons for

assigning little weight to Dr. Chamberlain's opinion, (3) failing to include her diagnosis of irritable bowel syndrome as a severe impairment at step two, (4) failing to account for all of her limitations in his RFC assessment, and (5) determining that she could be gainfully employed.[3] As explained below, the Court concludes that the ALJ did not err in discounting Flowers' testimony, but he did err in assigning "less weight" to Dr. Chamberlain's opinion. Dr. Chamberlain's opinion, when credited as true, establishes that Flowers is disabled. Accordingly, this case should be remanded for an award of benefits.

**A.      The ALJ Did Not Err in Discounting Flowers' Symptom Testimony.**

**1.      Applicable Law**

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide specific, clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

_____

[3] In her opening brief, Flowers asserted, without elaboration, that the ALJ "erred in rejecting the lay evidence[.]" (Pl.'s Br. at 1, 20.) In response, the Commissioner argued that Flowers waived any challenge to the ALJ's treatment of lay witness testimony by failing to present any specific argument or legal citation in support of her assertion. (Def.'s Br. at 2 n.2.) Flowers did not contest the Commissioner's waiver argument in her reply brief. (*See* Pl.'s Reply Br. at 1-9.) The Court agrees with the Commissioner that Flowers has waived any argument about the ALJ's treatment of lay witness testimony by failing adequately to brief that issue. *See Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 959 n.2 (9th Cir. 2010) ("[Plaintiff]'s one-sentence argument on how it was prejudiced is woefully insufficient, and [Plaintiff] has waived the argument by failing adequately to brief it.").

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted).[4] Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'") (citation omitted).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," and (2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Morgan*, 169 F.3d at 600).

---

[4] The Commissioner disputes the validity of the clear and convincing standard of review, encouraging the Court to apply the more deferential substantial evidence standard of review. (Def.'s Br. at 5-6.) The Court declines to do so because the Ninth Circuit recently rejected the Commissioner's argument. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (reaffirming that an ALJ must provide "specific, clear and convincing reasons" to discount the testimony of a Social Security claimant); *cf.* Def.'s Br. at 6 ("*Burrell* rejected the Commissioner's argument . . . that ALJs are not required to provide 'clear and convincing reasons.'").

2.      **Application of Law to Fact**

There is no affirmative evidence showing that Flowers is malingering and, therefore, the ALJ was required to provide specific, clear, and convincing reasons for discounting Flowers' testimony. The ALJ did so in this case.

First, the ALJ concluded that Flowers' credibility was "undermined by a historically tenuous connection to the workforce—even prior to her alleged onset date." (Tr. 15.) In support of this conclusion, the ALJ observed that Flowers "quit working on a full-time basis in 2002 because she wanted to move back to Oregon." (Tr. 15, 139.) The ALJ, in turn, found that Flowers' "chronic unemployment involved a volitional aspect that was unrelated to her severe health problems." (Tr. 15.)

Flowers argues that the ALJ erred in concluding that she had a poor work history because, although she did not report earnings after 2002, "she continued to work after 2002." (Pl.'s Br. at 16.) This argument is not persuasive. Regardless of whether Flowers continued to work part-time after 2002, the fact remains that she only engaged in substantial gainful activity during two of the last fifteen years.[5] (*See* Tr. 48, 131-32.) Accordingly, substantial evidence supports the ALJ's finding that Flowers' credibility is undermined by her historically tenuous connection to the workforce. *See Kral v. Astrue*, No. 1:10-cv-01483, 2011 WL 4383111, at *7-8 (E.D. Cal. Sept. 20, 2011) (upholding adverse credibility determination based, in part, on the claimant's "poor work history with only

---

[5] "Past relevant work is work that [the claimant has] done within the past [fifteen] years, that was substantial gainful activity, and that lasted long enough for [them] to learn to do it." 20 C.F.R. § 416.960(b)(1). "Substantial gainful activity is work activity done for pay or profit that involves doing significant physical or mental activities, taking into account the nature of the work, how well it is performed, whether it is performed under special conditions, self-employment, and time spent working." *Yarrito v. Astrue*, No. 09-cv-1952, 2010 WL 5348737, at *4 n.2 (C.D. Cal. Dec. 21, 2010).

[seven] full substantial gainful activity years in the past [fifteen]"); *Taylor v. Colvin*, 618 F. App'x 342, 343 (9th Cir. 2015) (holding that the ALJ provided specific, clear, and convincing reasons for discounting the claimant's testimony, and citing the ALJ's reliance on the claimant's "poor work history").

Second, the ALJ found Flowers not credible based on her reported activities. Engaging in "activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) (citations omitted). In this case, the ALJ cited Flowers' reported ability to "perform compensated cleaning services and collect recyclable cans," which the ALJ found to be consistent with an ability "to perform a variety of light-level tasks in spite of [Flowers' allegedly disabling] medical condition." (Tr. 14.)

Flowers argues that "earning five cents a can and cleaning a few houses is not inconsistent with her claim for disability." (Pl.'s Br. at 14.) Flowers testified that her can collecting activities involved walking three to four miles per day, and spending twenty-five to thirty hours each week checking dumpsters, parks, and the city center for cans to recycle. It was reasonable for the ALJ to find that the aforementioned activities, which would presumably encompass periods of time when Flowers lacked ready access to a restroom, are inconsistent with her claim of disability. (*Cf.* Tr. 35, "I can do things as long as I have access to a bathroom and I get to it right then and there"; Tr. 50, questioning whether the jobs identified by the VE would be suitable for a person who needs "ready access to [a] restroom"; Pl.'s Reply Br. at 6, "Plaintiff's condition is disabling because she suffers from pain, uncomfortable bloating, and from irregular bowel patterns requiring ready access to a bathroom. She does not have specific functional limitations, other than the need for quick and

Page 18 - FINDINGS AND RECOMMENDATION

repeated breaks from the workplace to use the restroom.").[6] Accordingly, the Court finds that Flowers' reported activities support the ALJ's adverse credibility determination.

The ALJ also rejected Flowers' testimony based on medical findings that were inconsistent with a debilitating gastrointestinal disorder. (Tr. 14.) Even if the ALJ so erred, any error was harmless in light of the ALJ's other findings that provide substantial evidence for the ALJ's adverse credibility determination. *Cf. Garza v. Astrue*, 380 F. App'x 672, 673-74 (9th Cir. 2010) (affirming the ALJ's adverse credibility determination despite finding that three of the four reasons stated explicitly by the ALJ were not clear and convincing).

Although this Court may disagree with the ALJ's adverse credibility determination, the Court finds that the ALJ's determination is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation . . . may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it.").

**B.    The ALJ Erred in Assigning Less Weight to Dr. Chamberlain's Opinion.**

**1.    Applicable Law**

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas*, 278 F.3d at

---

[6] The Court notes that Flowers complained of diarrhea during the time period she was collecting cans, and that Flowers continued collecting cans after she alleged the onset of disability. (*See* Tr. 29, 135-36, 138-39, 147, 163, 244.)

956-57). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions, however, is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

### 2.    Application of Law to Fact

Flowers argues that the ALJ erred in assigning "less weight" to Dr. Chamberlain's opinion, in particular Dr. Chamberlain's estimate of potential workplace absenteeism. As discussed below, the Court agrees.

Dr. Chamberlain's opinion conflicted with those of the non-examining state agency medical consultants, none of whom opined that Flowers would have absenteeism issues. Therefore, the ALJ was required to provide specific and legitimate reasons for assigning less weight to Dr.

Page 20 - FINDINGS AND RECOMMENDATION

Chamberlain's opinion.[7] *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician'"); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ failed to meet the requisite standard.

The ALJ provided three reasons for assigning less weight to Dr. Chamberlain's opinion that Flowers would be absent from work twice a month due to gastrointestinal issues: (1) Dr. Chamberlain stated explicitly that his opinion was "only an estimate," (2) record evidence suggested that Flowers "could minimize her workplace absences by monitoring her own diet," and (3) Dr. Chamberlain stated that Flowers' irritable bowel syndrome "symptoms were 'stable' on medication." (Tr. 15.) The Court finds that these reasons are not supported by substantial evidence.

As an initial matter, "[a] doctor's notation that a condition is 'stable' during treatment does not necessarily support the conclusion that the patient is able to work." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008); *see also Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (observing that the ALJ had a "tendency to overlook or mischaracterize relevant evidence," and noting that "the ALJ consistently interpret[ed] reports that [the claimant's] condition has been 'stable' to mean that [her] condition has been good, when the term could mean only that her condition has not changed"). The use of terms such as "stable" must be read in context of the overall

---

[7] The Court declines to address the Commissioner's argument regarding the validity of the clear and convincing reasons standard, because the specific and legitimate reasons standard applies here.

diagnostic picture drawn by the doctor. *See Holohan*, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws."); *Emmons v. Comm'r of Soc. Sec.*, 2:14–cv–0488, 2015 WL 2374322, at *3 (E.D. Cal. May 18, 2015) (explaining that terms like "'stable' may well in some cases plausibly indicate that an impairment is well controlled and not disabling, but such terms must always be read and interpreted in context"). The ALJ failed to read and interpret Dr. Chamberlain's statement in the proper context, and, consequently, failed to give due consideration to the fact that the treatment note in question also stated that Flowers "continues to have abdominal pain and alternating constipation and diarrhea." (Tr. 428-29.) Thus, it was not proper for the ALJ to reject Dr. Chamberlain's opinion based on his notation that Flowers was stable on medication, because it appears that Flowers' condition had not changed in any meaningful way. *See also Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) ("Nor was it proper for the ALJ to reject Dr. Erro's opinion based on Dr. Erro's notation that Morales was stable with medication.").

Additionally, the ALJ placed undue emphasis on a treatment note completed by Dr. Fontus on August 9, 2011, wherein he noted that Flowers was able to self-treat her abdominal pain by sticking "to a non-meat bland diet and when she feels the pain coming on, she goes to a clear liquid diet and take a gentle stool softener [to make herself go to the bathroom]." (Tr. 325.) The ALJ interpreted Dr. Fontus' treatment note as suggesting that Flowers "could minimize her workplace absences by monitoring her own diet." (Tr. 15.) The ALJ's interpretation is flawed. Over a year after Dr. Fontus issued the above treatment note, Flowers continued "to have abdominal pain and alternating constipation and diarrhea," despite "depriv[ing] herself of a lot of different foods," including dairy. (Tr. 428, 439.) Dr. Fontus' note also makes clear that Flowers was speaking about

ways in which she addressed episodes that were similar to the bouts with constipation that caused her to be hospitalized in December 2009 and January 2011. (Tr. 325, "Since January, she has [two] similar episodes, [one] in March and [two] in June. They were exactly the same and they involved right-sided abdominal pain associated with low-grade fever, distention and constipation. She states that she was able to treat both of those episodes[.]") Considering the sporadic nature of these constipation "episodes," coupled with Flowers' need to treat these episodes with a stool softener while suffering from the primary diagnosis of irritable bowel syndrome (Tr. 343, 368), substantial evidence does not support the ALJ's determination that Flowers could minimize her workplace absences by simply monitoring her diet.

The remaining reason the ALJ gave for discounting Dr. Chamberlain's opinion was that it was "only an estimate." (Tr. 15.) Courts have found this to be a legally sufficient reason to reject a doctor's opinion. In *Robertson v. Astrue*, No. 09–CV–0501, 2011 WL 578753 (W.D.N.Y. Feb. 9, 2011), for example, the district court found that "it was within the ALJ's discretion to reject the physician's estimates that the plaintiff may be absent from work more than four day per month, finding it too speculative given the likelihood that the [severe impairment at issue] would heal with proper care." *Id*. at *5. Unlike *Robertson*, however, Flowers' irritable bowl syndrome is a "chronic" condition. (Tr. 351.) Dr. Chamberlain was also the only examining or treating doctor to offer an opinion on potential absenteeism, and his opinion is no more an "estimate" than the residual functional capacity assessment completed by the non-examining state agency consultant, which was given great weight. In the absence of other legally sufficient reasons for discounting Dr. Chamberlian's opinion, the Court concludes that the ALJ failed to afford the deference to which Dr. Chamberlain was entitled under the Social Security Administration regulations and Ninth Circuit

Page 23 - FINDINGS AND RECOMMENDATION

precedent. *See Garrison*, 759 F.3d at 1013 (holding that "the ALJ committed a variety of egregious and important errors," and stating that the ALJ "failed to afford the deference to which [the specialist] was presumptively entitled under both Social Security regulations and [Ninth Circuit] precedent as [the claimant's] treating physician").

## C.    Remedy

"[T]he Ninth Circuit has held that, in social security cases, where the ALJ improperly discredited either a claimant or a treating physician's testimony, that 'it would be an abuse of discretion for a district court not to remand for an award of benefits when [certain] conditions are met.'" *Aparicio v. Colvin*, ---- F. App'x ---- , 2015 WL 9461608, at *3 (9th Cir. Dec. 28, 2015) (quoting *Garrison*, 759 F.3d at 1020). Specifically, a district court should remand for an award of benefits when the following "credit-as-true" criteria are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id*. Even if these criteria are met, however, "the court retains the 'flexibility' to remand for further proceedings where 'an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.'" *Id*.

In this case, there are no issues that could benefit from further development of the record. In response to a question based on Dr. Chamberlain's opinion regarding potential absenteeism, the VE testified that "two [absences] per month on ongoing basis would be unacceptable" in "lower skill level jobs." (Tr. 49.) The ALJ identified four suitable positions for Flowers: waitress, routing clerk, laundry sorter, and cleaner/polisher. The latter three positions are unskilled positions (Tr. 16-17), and

the position of waitress "at best is semi-skilled." (Tr. 52.) In other words, the waitress position is at the low end of the spectrum of semi-skilled positions. *See Fitzgerald v. Colvin*, No. 1:14-cv-0052, 2014 WL 5463932, at *4 (E.D. Cal. Oct. 27, 2014) (noting that the VE testified that the position of waitress is at "the low end of semiskilled"); *Dekruger v. Comm'r of Soc. Sec.*, No. 08-10410, 2009 WL 596123, at *5 (E.D. Mich. Mar. 9, 2009) (same)*; Schafer v. Barnhart*, No. 01-cv-1113, 2002 WL 1822111, at *4 (S.D. Ind. June 25, 2002) (same). If Dr. Chamberlain's improperly discredited opinion evidence is credited as true, the ALJ would be required to find Flowers disabled on remand, because missing work twice a month would be unacceptable in the "lower skill level jobs" of waitress, routing clerk, laundry sorter, and cleaner/polisher. Remand to the ALJ for a calculation and award of benefits is therefore appropriate here, because the Court is unable to say that the record as a whole creates serious doubt about whether Flowers is, in fact, disabled.

## V. CONCLUSION

For the foregoing reasons, the Commissioner's decision should be reversed and remanded for an award of benefits.

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a

response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 11th day of February, 2016.

_____
STACIE F. BECKERMAN
United States Magistrate Judge

Page 26 - FINDINGS AND RECOMMENDATION